DAVIS, Director General of Railroads, et al. v. NORTH BANK DOCK CO.

(District Court, D. Oregon. December 31, 1923.)

1. **Wharves ⊜⇒9—Lease and supplemental lease of dock, fixing minimum rental and tonnage rental, construed.**

Where lessee leased sections C and D of a dock under a lease fixing a minimum rental and a tonnage rental, and by a subsequent supplemental lease lessee leased sections A and B of the same dock at a fixed tonnage rental, *held*, that the amount paid lessor as tonnage rental for all four sections should be credited against the minimum rental, in view of the construction of the parties.

2. **Contracts ⊜⇒170(1)—Practical construction of parties entitled to great influence in case of ambiguity.**

Where a contract is ambiguous, the practical construction which the parties have uniformly given it is entitled to great, if not controlling, influence.

3. **Costs ⊜⇒40—Costs follow judgment, defendant admitting liability, but making no tender.**

Where defendant admitted that a stated amount was due, but made no tender, either before or after the action was instituted, costs follow a judgment for plaintiff for that amount.

Action by James C. Davis, Director General of Railroads, and another, against the North Bank Dock Company. Judgment for plaintiffs for the amount admitted by defendant to be due.

Carey & Kerr, Charles A. Hart, and Robert B. Kuykendall, all of Portland, Or., for plaintiffs.

McCamant & Thompson and Charles S. Cohn, all of Portland, Or., for defendant.

WOLVERTON, District Judge. This is an action to recover upon an alleged balance of dock rental, in the sum of $3,590.03, and is based upon a lease of date April 11, 1919, whereby the Spokane, Portland & Seattle Railway Company leased to the North Bank Dock Company certain sections of what is known as the Weidler Dock, for the period of one year from May 15, 1919. The defendant claims that the dock rental has all been paid, except $348.15. The amount in dispute is the difference between this latter sum and the sum sued for.

[1] The controversy concerns the correct legal construction of the lease, and, in that relation, the proper bearing of a certain other contract between the parties, of date October 23, 1917. In order to understand the real import of the lease, it is requisite that we take note of two leases antedating this one, touching the identical dockage privileges. The first of these bears date April 30, 1914, and is for a term

---

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of two years, covering property described as "sections C and D of that certain property known and described as the Weidler Dock." The rental prescribed is 20 cents per ton for each and every ton of grain handled over the "premises," payable monthly:

"Provided, that the minimum rental for the full term hereof shall be eight thousand dollars ($8,000.00), and if, at the end of the term, the payments herein required to be made shall total less than eight thousand dollars ($8,000.00) the lessee shall thereupon pay to the railway company, as additional rental, such sum as shall be necessary to make the total rental payment for the full term hereof, equal to said sum of eight thousand dollars ($8,000.00). * * * The lessee further covenants that, when the railway company shall determine it to be necessary in order to facilitate the handling of cargo to and from ships and shall notify the lessee accordingly, it (the lessee) shall and will permit the railway company to place its freight upon any portion of the sections of the dock hereby leased; and in the event that any such space is so used by the railway company, the railway company shall, during the time of such use, furnish to the lessee, at no added expense to the lessee, such space upon sections A and B of said Weidler Dock, or either of them, as will enable the lessee to handle the grain it may have, not in excess, at any one time, of twenty thousand (20,000) tons."

On March 31, 1916, the parties entered into the second lease referred to, in which, by mutual agreement, all of the covenants, agreements, and provisions of the first were continued in full force and effect for the period of three years, beginning May 15, 1916. The lease which is the basis of this controversy bears date April 11, 1919. It recites the facts of execution of the leases of April 30, 1914, and March 31, 1916, and the desire of the parties "to extend said lease for a period of one year from May 15, 1919, to May 15, 1920," and thereupon provides that the lease may be so extended, in consideration of the payment of 25 cents per ton for each and every ton of grain handled over the leased premises, that the minimum rental for the year shall be $10,000, and that:

"Except for the changes in rental as herein provided all of the covenants, agreements, terms, and provisions of said original lease shall continue in force and effect during the extension of this lease."

The contract of October 23, 1917, after reciting preliminarily the facts of the leasing of April 30, 1914, the extension of March 31, 1916, and the desire to include therein "sections A and B of said dock," provides that:

"There shall be included from and after the date of the execution of this instrument under the terms of said lease sections A and B of the Weidler Dock, subject to termination as herein provided, in consideration whereof the dock company agrees to pay to the railway company for the use of said sections A and B of said dock thirty (30) cents per ton for the first sixty (60) days' storage of grain therein and seven and one-half (7½) cents per ton per month for all storage of grain therein after the first period of sixty (60) days shall have expired. It is further agreed that no grain shall be stored in sections A and B of said dock when the same will interfere with the business of the railway company. * * * It is further agreed that the right of the dock company to store grain in sections A and B shall continue until April 1, 1918, and thereafter shall be subject to cancellation on thirty (30) days' notice in writing by either party. * * * Except as herein provided, the right of the dock company to use sections A and B shall in all respects be as provided for in said original lease covering sections C and D,

but the making of this supplemental·agreement shall in no way change the terms of said original lease as to sections C and D, except as to the special provisions herein contained applicable only to sections A and B."

The real dispute is touching whether defendant should have credit for rentals arising on account of grain handled over or stored upon sections A and B of the dock as against the minimum rental provided for in the lease. The railway company has given credit for the rentals for grain handled over C and D, but denies that defendant is entitled to credit for rentals arising from grain stored upon sections A and B. This presents the single inquiry for consideration and decision. The facts are that the railway company has received the entire rentals arising from grain handled over and stored upon the four sections—A, B, C, and D—which amount to the sum of $9,651.85. It has given credit to the defendant for $6,409.97, but refuses credit for the difference, namely, $3,241.88, and claims that the latter sum, having arisen from rentals for storage of grain upon sections A and B, ought not to be offset against the minimum rental provided for of $10,000. The defendant admits liability to the extent of $348.15.

The contract of October 23, 1917, is simply what it purports to be, an agreement supplemental to the lease of March 31, 1916, the then last renewal, which was at the time in full force and operation. Its purpose was to extend the lease to allow the dock company the further use of sections A and B for storage purposes, and to fix a rental for such use, which consisted of a tonnage charge on the amount of grain stored. The terms and conditions of the lease were in no way varied, added to, or subtracted from, except as specified in the contract. Otherwise they all remained in full effect and operative. The minimum rental charge and the conditions governing the same remained as stipulated in the lease. No other provisions were made varying such conditions. The contract being supplemental only, it must be deemed that such conditions were intended and designed to govern as it respects sections A and B, as well as C and D. If not, it should have been so specified, as the parties could readily have done. It thus results that, as an entire contract, the lease, with the supplementary contract added, provided for a minimum rental charge applicable to all premises included, and to all charges for handling and storage.

It seems that the contract of October 23, 1917, remained uncanceled prior to the time when this controversy arose, and was in force when the lease under which plaintiffs claim rental was executed. Now, while the contract is not specifically mentioned in the preamble, the lease itself must be considered to be a renewal of the prior lease incumbered with the contract, with the single change with respect to the minimum rental. The language is that:

"The railway company agrees that said lease may be so extended, in consideration whereof the dock company promises and agrees to pay as monthly rental for said premises a sum equal to twenty-five (25) cents for each and every ton," etc.,

—and that a minimum yearly of $10,000 shall be paid. I am unable to see how this lease can be disassociated from the contract which was supplemental to and a part of the lease which was renewed. It was

no doubt intended that the parties should bear the same relations and be subject to the same obligations and liabilities that obtained under the prior lease, supplemented by the contract, except as to the specified changes made touching the monthly rental and the minimum yearly rental.

Viewing the proposition from another angle, it never was intended that the contract of October 23d should operate independently, or otherwise than as supplementary in character. It was therefore either annulled by the expiration of the renewal lease of March 31, 1916, or it must be held to be supplemental to the lease upon which this action is based. I am impelled to the conclusion that such contract must be considered to be supplemental to the latter lease also. I was impressed at the trial that the contract was independently operative, but further study has led to a contrary conclusion.

This construction is borne out by the acts of the parties concerned, and their treatment of the contractual relations existing between them. The treatment has been uniform throughout the entire relationship of the several leases, and not varied in the least by reason of the contract of October 23, 1917. Mr. Leon Boyer testifies, among other things:

"There hasn't been a year, whenever we were hampered in C and D, whenever we got hampered at all, that we didn't have permission from the railroad company, or superintendent who was handling the business for the railroad company, to put grain on sections B or A, either one; upper A or B, or the lower A or B, as the case may require. * * * We paid the bills as rendered. There was never any question as to whether it moved over A, B, C, or D. * * * We were given credit for all grain handled over the entire dock."

James Gillespie testifies:

"Q. Prior to the 23d of October, 1917, state whether or not it was customary to segregate tonnage moved as between sections A and B, on the one hand, and sections C and D on the other. A. No; it never had been up to that point. Q. And subsequent to that date, when there was a different rate charged for the use of A and B, did you segregate? A. No, sir. Q. All went in together, did it? A. After that date, yes; I had to segregate it. Q. You had to segregate? A. Yes. Q. You had to segregate after that date because it was carrying a different rate per ton? A. Yes; I only started to segregate after that October, 1917—I believe it was—agreement was entered into."

And W. C. Wilkes states that, in figuring the minimum rental chargeable to the North Bank Dock Company, there was no segregation of the tonnage as between sections A and B and C and D, during the years of handling the business; nor was there, to his recollection, any segregation after the contract of October 23, 1917.

Defendant's Exhibits 1 and 2, which are rental statements rendered by the railway company for the periods inclusive of May, 1916, to April, 1917, and May, 1917, to April, 1918, show, respectively: Minimum rental, $8,000, and amount of grain handled at 20 cents, $7,939.98, leaving balance due company $60.02; minimum rental, $8,000, and amount of grain handled at 20 cents, $7,881.74, leaving balance due company $118.26. The latter exhibit is peculiarly forceful, as it comprises the rentals from October, 1917, to April, 1918, inclusive, being for a period subsequent to the October 23d contract.

[2] The construction which the parties concerned have uniformly given a contract, which they are mutually operating under and carrying into practical execution, is entitled to great, if not controlling, influence, where the contract is attended with ambiguity respecting its real meaning. Chicago v. Sheldon, 9 Wall. 50, 54, 19 L. Ed. 594; Spande v. Western Life Indemnity Co., 68 Or. 171, 188, 136 Pac. 1189.

[3] These considerations lead to the conclusion that plaintiffs are only entitled to recover the sum of $348.15, the amount admitted by the defendant to be due. It is not shown that a tender of this amount was made, either before or after the action was instituted; hence costs must follow the judgment. A general verdict will be rendered. If the parties, or either of them, desire to tender special findings, in order to save their rights on appeal, they may do so within 10 days after its rendition.